IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DARTAVIS SHELTON,

                Plaintiff,                OPINION AND ORDER

  v.

                                                    18-cv-341-wmc

PETE ERICKSEN, JEAN ZWIER,
MICHAEL BAENEN, SARAH COOPER,
LT. GAVIN, OFFICER COONEY,
LT. VANGHEEM, AND NURSE
GARLAND,

                Defendants.

*Pro se* plaintiff Dartavis Shelton, who was previously incarcerated at Green Bay Correctional Institution ("GBCI"), has filed a civil action against eight employees and administrators working at GBCI. Shelton claims that defendants violated his constitutional rights at different points in 2012 and 2013 by failing to provide him necessary medical care and using excessive force against him. While normally at this stage the court would screen his complaint pursuant to 28 U.S.C. §§ 1915(e)(2), 1915A, his complaint, outlining two unrelated groups of claims and defendants, violates Federal Rule of Civil Procedure 20. Accordingly, Shelton will be required to choose which lawsuit he would like to proceed on under this case number, and indicate whether he wishes to open another lawsuit to pursue his other claim.

ALLEGATIONS OF FACT[1]

Plaintiff Dartavis Shelton was incarcerated at GBCI during the time when his claims

---

[1] In addressing any pro se litigant's complaint, the court must read the allegations generously. *Haines v. Kerner*, 404 U.S. 519, 521 (1972). For purposes of this order, the court assumes the

arose. He names eight defendants, who were security officers or directors, healthcare officials, or administrators at GBCI during the relevant time periods. The defendants are Security Director Pete Ericksen, Health Services Unit Manager Jean Zwier, Warden Michael Baenen, Deputy Warden Sarah Cooper, Lt. Gavin, Officer Cooney, Lt. VanGheem, and Nurse Garland.

**A. Off-Site Hospitalizations at St. Vincent Hospital**

Shelton's first lawsuit arises from two separate off-site hospitalizations at St. Vincent Hospital in Green Bay. On each occasion, Shelton was hospitalized due to complications from his Type I Diabetes and Sickle Cell Anemia, and he was forced to wear metal restraints (including handcuffs, leg shackles, and a "Bandit" electric shock device) nonstop for the duration of his stay.

Shelton was first hospitalized between March 21 and 29, 2012. On the second day of his treatment, Shelton noticed an adverse skin reaction to the restraints, with blisters and redness occurring near the contact sites on his wrists, ankles, and calf. Shelton asked his escort officer, Sgt. Kohler, if he could remove the restraints to allow the swelling and redness to subside. Sgt. Kohler called Lt. Stevens at GBCI, who advised Kohler "'not to remove and/or alter' the full restraint application in any manner." (Compl. (dkt. # 1) ¶ 15.) Shelton continuously objected to wearing the restraints for the remainder of his hospitalization. At one point, a nurse attempted to address the injuries by placing medical

following facts based on the allegations in plaintiff's complaint, unless otherwise noted, drawing all reasonable inferences in a light most favorable to plaintiff.

2

tape between the metal restraints and Shelton's skin, but this "still didn't prevent [Shelton] from suffering physical injuries to his forearms/wrists, legs/ankles, and calf areas." (*Id.* ¶ 20.) As a result of wearing the restraints, Shelton experienced "continuous pain, months of tenderness in the areas of [his] injuries . . . mental agony from the serious threat of infection, and scarring on both of [his] arms/wrists and legs/ankles and calf." (*Id.* ¶ 24.)

Shelton filed a complaint about the incident, but his filing was returned to him with instructions to first discuss the incident with the GBCI Security Director, defendant Pete Ericksen. Ericksen denied Shelton's request for a review of the incident, stating that "'wishes' of security over-ride any physical injury" Shelton may have experienced. (*Id.* ¶ 17.) Shelton thereafter filed another complaint that was investigated by Internal Complaint Examiner ("ICE") Michael Mohr. In his report on the incident, Mohr wrote that the "arm and leg restraints were checked every shift and were found not too tight by GBCI staff. Sgt. Kohler stated that movement by Mr. Shelton while he was sleeping appeared to be the problem." (Compl., Ex. H (dkt. #1-2) 8.) The report ended by stating that "[i]t is very unfortunate that he sustained cuts but due to security concerns and the fact that they do not have a security unit, restraints are to stay on at all times." (*Id.*) Shelton appealed Mohr's decision, but defendant Baenen denied the appeal on May 25, 2012. Shelton appealed Baenen's decision to dismiss his complaint, but, similarly, to no avail.

Shelton was next hospitalized between January 14 and 28, 2013. Once again, Shelton was forced to wear metal handcuffs, leg shackles, and the "Bandit" electric shock device for the duration of his treatment. Soon after he was admitted to St. Vincent,

Shelton began experiencing similar adverse reactions to the metal restraints and "Bandit" electric shock device. Dr. Sarah J. Lulloff conducted a physical examination of Shelton on January 18, 2013. In her report, Dr. Lulloff noted that Shelton had "2 round wounds measuring about 1.5 cm over the right lateral leg." (Compl. Ex. O/2 (dkt. #1-1) 3.) She also noted that the wounds occurred where the "Bandit" device was secured to the leg, and that the guards rotated the device's location.

Despite the injuries reported by Dr. Lulloff, Shelton was required to wear the metal restraints and "Bandit" electric shock device twenty-four hours per day for his entire two-week treatment at St. Vincent. Shelton continued to object to wearing the restraints and directed his complaints to defendant Cooney, who was his escort officer. Cooney discussed Shelton's complaints with Lt. Gavin at the Security Department at GBCI. Lt. Gavin responded by saying that the restraints and "Bandit" device were to remain in place, regardless of any type of injuries they were causing.

On January 29, the day after Shelton returned to GBCI, he was evaluated by GBCI Nurse C. Baier. The nurse reported that Shelton had "two open areas on [right] calf. One area . . . is a nickel size of granulation tissue with a small scab in the center . . . [and the] second area [is] dime size with scabbed area below." (Compl. Ex. P/1 (dkt. #1-2) 16.) The nurse also noted that there was a "risk for infection." (*Id.*)

At some later point after his return to GBCI, defendants Cooper and Zwier told Shelton that the restraints were required as part of the off-site security protocol, which had been approved by defendant Baenen, and implemented "on the express request of Ericksen." (Compl. (dkt. #1) ¶ 31.) Soon after, Shelton filed an inmate complaint, and

4

ICE Mohr investigated the incident. In his report, Mohr wrote that "Officer Cooney stated that there were marks on the right leg of Mr. Shelton . . . . HSU Manager Zwier stated any leg restraints could be the irritants if [Shelton] was moving and fighting against them." (Compl. Ex. S (dkt. # 1-2) 19.) He concluded by stating that "[w]hether the scars were caused by the band-it or by the actions of the inmate would require speculation . . . that would be improper." (*Id.*) Shelton appealed, but Baenen upheld the decision to dismiss the complaint. In his review of the decision, Baenen wrote, "I do not believe this should be a medical complaint -- the bandit is not a medical device, it is a security device. I do not have the expertise to make a decision on this." (Compl. Ex. T (dkt. #1-2) 21.)

B. Use of Force Incident

Shelton's second lawsuit arises from an event that occurred about one month before the first hospitalization. On February 18, 2012, Shelton was treated for type I Diabetes and Sickle Cell Anemia in GBCI's Health Services Unit ("HSU"). Nurse Garland instructed Shelton to eat so that Garland could give him medicine, but Shelton refused because he was in too much pain to move or sit-up to eat. Garland requested that Lt. VanGheem physically move Shelton from his bed to a chair and force Shelton to eat. Nurse Garland left the room after requesting Lt. VanGheem's help "in order to not be a witness to this requested use of force." (Compl. (dkt. #1) ¶ 44.) Lt. VanGheem then picked Shelton up and forcibly sat him in a chair and attempted to feed him. Shelton further refused, and Lt. VanGheem then tossed Shelton onto the floor. Shelton states that this caused a severe amount of pain and exacerbated the pain he was already feeling.

Shelton filed a complaint regarding this incident on February 27, 2012. (Compl., Ex. X (dkt. # 1-2) 26.) This filing was returned to Shelton with instructions to first discuss the incident with Ericksen and Zwier. The complaint does not explain what happened as a result of that discussion, but it does explain, and the exhibits show, that Shelton filed another complaint, but that Examiner Mohr found that no excessive force was used and the actions taken by Nurse Garland and Lt. VanGheem were appropriate. Shelton appealed this finding, but the decision to dismiss his complaint was upheld.

OPINION

Under Rule 20 of the Federal Rules of Civil Procedure, a plaintiff may join claims together in one lawsuit if "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences." Fed. R. Civ. P. 20(a)(1)(A). If a complaint includes unrelated claims against different defendants in violation of Rule 20, a court may order that the lawsuit be severed. *Lee v. Cook Cty., Ill.*, 635 F.3d 969, 971 (7th Cir. 2011); *In re High Fructose Corn Syrup Antitrust Litig.*, 361 F.3d 439, 441 (7th Cir. 2004); *Aiello v. Kingston*, 947 F.2d 834, 835 (7th Cir. 1991). Although Federal Rule of Civil Procedure 18 allows a party to join unrelated claims against defendants in a single suit, this rule applies only after Rule 20's requirements for joinder of parties have been satisfied. *Intercon Research Ass'n, Ltd. v. Dresser Ind., Inc.*, 696 F.2d 53, 57 (7th Cir. 1983). This means that the core set of allowable defendants must be determined under Rule 20 before a plaintiff may join additional unrelated claims against one or more of those same defendants under Rule 18. Fed. R. Civ. P. 18(a).

Applying Rules 18 and 20, plaintiff's allegations can be grouped into at least two different lawsuits:

> **Lawsuit 1: Plaintiff's claims related to the March 2012, and January 2013, hospitalizations at St. Vincent, and his subsequent injuries and scarring that resulted from wearing the metal restraints and Bandit electric shock device.**
>
> **Lawsuit 2: Plaintiff's claims relating to the use of force incident from February 2012.**

These two lawsuits involve different incidents and defendants. While plaintiff argues that the incidents together indicate a pattern of statutory and constitutional violations, his hospitalizations and the use of force involved different groups of defendants: his claim arising from his hospitalizations at St. Vincent Hospital do not implicate defendants Garland and VanGheem, and plaintiff's claim arising from the use of force incident does not implicate defendants Baenen, Cooper, Gavin, and Cooney.[2]  Thus, plaintiff has violated Rule 20 by grouping these claims together.

Because plaintiff's complaint violates Rule 20, the court will direct plaintiff to respond to this order explaining how he wishes to proceed on his claims. Plaintiff may proceed on only one of the identified lawsuits under this case number. If he wishes to pursue the other lawsuit identified above, he must do so by filing a separate complaint related to those claims, which will be assigned a new and distinct case number. Plaintiff will be required to pay a separate filing fee for any additional lawsuit on which he chooses to proceed.

---

[2] Plaintiff's allegations suggest that he was told to inform Ericksen and Zwier of Lt. VanGheem's use of force *after* it occurred, but there is no indication that they were involved in, or aware of, the use of force incident.

Since it is not clear at this time which of his lawsuits plaintiff will pursue, he should be aware that the court has not reached any opinion about the merits of any claims raised in the lawsuits outlined above. Once plaintiff identifies the suit he wants to litigate under this case number, the court will screen it as required by §§ 1915(e)(2), 1915A. If plaintiff disagrees with the way the court grouped his claims, or if he believes the court has left out claims he intended to assert, he may also raise those objections in his response, provided that he still complies with this order and chooses which lawsuit he wants to pursue. If he fails to do this, the court will have no choice but to dismiss all his claims for failure to prosecute this case.

## ORDER

IT IS ORDERED that:

1) Plaintiff Dartavis Shelton has until **May 5, 2021**, to identify for the court which one of the lawsuits identified in this opinion he wishes to pursue under the case number assigned to his complaint.

2) No later than **May 5, 2021**, plaintiff must also inform the court whether he wishes to continue to prosecute his other claims as a separate lawsuit or withdraw it voluntarily. If plaintiff dismisses those other claims voluntarily, he will owe no further filing fee. If plaintiff advises the court he intends to prosecute his other lawsuit separately, he will (1) owe a separate $350 filing fee for each new lawsuit and (2) need to file a separate complaint setting forth his claims in that lawsuit.

3) If plaintiff fails to respond to this order by **May 5, 2021**, then the clerk is directed to enter an order dismissing without prejudice the entire lawsuit based on plaintiff's failure to prosecute it.

Entered this 15th day of April, 2021.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge